**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SEAN C., through his Parent HELEN C.,** | : | |
| *Plaintiff,* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **OXFORD AREA SCHOOL DISTRICT,** | : | **No. 16-5286** |
| *Defendant.* | : | |

# M E M O R A N D U M

PRATTER, J.                                                     AUGUST 14, 2017

        Plaintiffs—Helen C., along with her son, Sean C.—bring this action against the Defendant Oxford Area School District (the "School District") alleging that the School District failed to provide Sean with a Free Appropriate Public Education ("FAPE"), in violation of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq*. ("IDEA"). Plaintiffs maintain that the School District failed to fulfill its educational obligation to address Sean's needs arising from academic, social, emotional, and executive functioning difficulties.

        Following a special education due process hearing, a Hearing Officer concluded that the District did not deny a FAPE to Sean and denied Plaintiffs' request for compensatory education for the school years 2012–13 through 2014–15. Plaintiffs seek review of that decision pursuant to the IDEA. Plaintiffs and the School District have filed cross-motions for judgment on the administrative record. For the following reasons, the Court will grant the School District's motion, deny Plaintiffs' motion, and affirm the Hearing Officer's decision.

# I.    BACKGROUND[1]

## A.    Factual Background[2]

### 1.    Sean's Initial Individualized Education Programs

The School District initially identified Sean with specific learning disabilities in reading and written language at the beginning of Sean's 3rd grade year in August 2006, and found him eligible for services under the IDEA. (HOD ¶ 1; P-1 at 20).[3]  Sean's earliest Individualized Education Program ("IEP") was created by the School District in 2006.  (S-2).  Sean was reevaluated in June 2009, at the end of his 5th grade year.  (HOD ¶ 1).  Neither the conclusions in the August 2006 Evaluation Report nor the June 2009 Reevaluation Report[4] indicated that Sean had difficulty with attention, focus, or attendance.  (HOD ¶ 2).

Sean was reevaluated at the end of Sean's 8th grade year, in May 2012.  The reevaluation report indicated he had a 107 full scale IQ and a specific learning disability in reading comprehension, written language, and mathematics problem solving. (S-20 at 10–13).  The May

---

[1] The Administrative Record submitted to the Court contains documents with different labeling schemes. The Court will reference documents in the following manner: "HOD" refers to the Hearing Officer's Decision; "P-" refers to the Parent's Exhibits in the Due Process Hearing; "S-" refers to the School District's Exhibits in the Due Process Hearing; and "N.T." refers to the Notes of Testimony from the underlying Due Process Hearing.

[2] When a district court reviews an agency decision under the IDEA, "[f]actual findings from the administrative proceedings are to be considered prima facie correct."  *S.H. v. State–Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir.2003). The court must defer to the Hearing Officer's credibility judgments and factual findings unless it can point to contrary nontestimonial, extrinsic evidence in the record that justifies a contrary conclusion.  *Id.*  Accordingly, the Court's account of the facts here is largely based upon the HOD.  To the extent that the Court supplements this account with additional facts, it cites the document upon which it relies.

[3] As a 3rd grade student, Sean's parent and/or teacher rating scales indicated clinically significant or at-risk scores in, among other things, inattention,  perfectionism, oppositional behavior,  hyperactivity, and social problems. (P-1 at 4–5).  The August 2006 evaluation report did not include supports recommendations explicitly focused on emotional support;  they were largely focused on instructions that would facilitate Sean remaining on-task.  (P-1 at 10).  Sean has never been diagnosed with Attention-Deficit/Hyperactivity Disorder. (N.T. 201:5–6).

[4] On June 8, 2009, the School District completed a Reevaluation Report and found Sean was still IDEA eligible with a Specific Learning Disability in reading comprehension and written expression. (P-2 at 5).  During Sean's middle school years, Sean had some attendance issues.  He missed 12 or 13 core academic classes. (P-27 at 11).  In 8th grade, Sean missed 12 to 18 days from each of his core academic classes.  (P-27 at 12). In 7th and 8th grade, Sean received final grades ranging from A's to C's. (P-27 at 11–12).

2012 reevaluation report also showed that Sean's teachers report that he occasionally needed prompting to remain on task, was inattentive, and was sometimes tired and disorganized. HOD ¶ 4.

Prior to Sean's transition to high school, an IEP team meeting[5] was held on May 29, 2012 to develop a plan for Sean's 9th grade year. (S-21 at 8). In line with his identified learning disability, the IEP listed four academic goals: a writing goal, a math application goal, a math computational goal, and a reading comprehension goal. (HOD ¶ 5; S-21 at 26-29). The IEP did not include annual goals related to executive functioning, learning-related behaviors, social skills, or anxiety-related coping skills; those were addressed through Specially Designed Instructions ("SDIs").[6] (N.T. 260:6-23).

The IEP team created six SDIs, for Sean's 9th grade year. Two SDIs implemented through Sean's IEP included, for example, "[v]erbal prompts to keep Sean on task because he is often off task during teacher instruction," and "clear concise directions and additional repetition or rewording of written directions and chunk directions." (S-21 at 31). The only concern Sean's mother raised at the meeting regarded Sean "being successful at the high school." (S-21 at 17). The IEP does not specify whether Sean's mother was referring to academic, behavioral, or social success. Before the May 29, 2012 IEP was implemented, Sean's mother approved of the

---

[5] At different times throughout Sean's education, team meeting members included Sean, Sean's mother Helen, a special education teacher, a regular education teacher, a school psychologist/guidance counselor, or a local agency representative. (*See, e.g.*, S-21 at 10; S-27 at 11; S-32 at 9).

[6] *See* Pa. Dept. of Edu., Individualized Education Program (IEP) - (Annotated) - School Age (May 2017), http://pattan.net-website.s3.amazonaws.com/images/2017/05/23/Ann_IEP_Revised052417.pdf. ("Specially designed instruction means adapting, as appropriate, the content, methodology, or delivery of instruction to address the unique needs of the student that result from the student's disability and to ensure access of the student to the general education curriculum so that he or she can meet the educational standards.").

provision of special education and related services by signing a Notice of Recommended Educational Placement ("NOREP").[7] (S-21 at 38–41).

### 2. 2012–13 School Year (9th Grade)

The IEP goals set in May 2012 were in place for most of Sean's 9th grade year. (HOD ¶ 5). Some of Sean's 9th grade teachers reported he was consistently unfocused and easily distracted. (HOD ¶ 7). Teachers stated that Sean was only "sometimes" organized and prepared for class, displayed trouble focusing, was easily distracted, rarely followed directions, rarely completed assignments, rarely participated in class, rarely showed effort, and displayed a lack of self-discipline. (P-9 at 19). However, some teachers reported a conflicted account of Sean's behaviors and stated that Sean was often prepared and organized and had not shown any evidence of needing more time with assignments. (P-9 at 19).

His attendance and grades during 9th grade were poor. Over the course of his 9th grade year, Sean was absent 24 times from Homeroom and missed 16 History classes, 23 English classes, 17 Earth Science classes, 18 Spanish classes, and 20 Algebra I classes, which were year-long courses. (HOD ¶ 8; P-27 at 13). Sean also missed 9, 12, 12, and 12 classes in each of four semester-long courses. (HOD ¶ 8; P-27 at 13).

Sean did not receive strong grades. He his cumulative grade point average at the end of 9th grade was 0.9688. (HOD ¶ 9; P-27 at 13). He failed mathematics (Algebra I),[8] as well as

---

[7] *See* Pa. Dept. of Edu., Notice of Recommended Educational Placement/Prior Written Notice (NOREP/PWN) (Annotated) – School Age (Oct. 2014), http://pattan.net-website.s3.amazonaws.com/images/ 2015/01/27/NOREP_ANN_rev_PTI102814.pdf. ("The purpose of this notice is to summarize for the parents the recommendations of the Local Education Agency (LEA) for the child's educational program and other actions taken by the LEA.").

[8] In 9th grade, Sean was placed in a co-taught Algebra I class, where the general education teacher gave direct instruction and the special education teacher supported students one-on-one. (N.T. 252:15-20; N.T. 276:6-24). On December 5, 2012, Sean's Algebra I teacher emailed Sean's mother because was argumentative in class and reported that Sean was engaging in unacceptable behavior, was "easily distracted," and was missing some assignments. (S-25 at 1). Throughout spring 2013, Sean's mother and the teacher emailed about makeup work in an

half-year or quarter classes in graphic design, printing tech, and freshman seminar. (HOD ¶ 9; P-27 at 13). While his grades were poor, Sean made progress on each of the academic goals outlined in his IEP. (HOD ¶ 6).

To develop a plan for the next school year, the IEP team met on April 24, 2013. (S-27 at 9). At the meeting, Sean's mother raised concerns about his reading and writing. (S-27 at 21). The IEP team addressed academic subjects and modified Sean's goals for written expression, mathematics and reading comprehension. (HOD ¶ 11; S-27 at 29-31). The number of SDIs for the upcoming school year were reduced from six to five. (*Compare* P-8 at 24 *with* P-9 at 32). The SDIs included, for example, "[c]lear and concise verbal directions and additional repetition or rewording of written directions and chunk directions;" "[p]referential seating near the point of instruction because Sean is very easily distracted by others;" and "[v]erbal [p]rompts to keep Sean on task because he is often off task during instruction." (HOD ¶ 12; S-27 at 32). The team added academic lab to Sean's 10th grade schedule, where Sean would receive support from a special education teacher in a small group classroom. (S-27 at 23; N.T. 368:19–369:5).

### 3. 2013-14 School Year (10th Grade)

Sean began his 10th grade year at Technical College High School in the carpentry program, but eventually switched to the computer program. (S-43 at 2-3; N.T. 195:6-24). Sean's grades improved significantly, but some teachers reported he was often distracted in class, needed prompting to complete assignments, could be argumentative, and failed to follow direction. (HOD ¶ 14; P-11 at 7; N.T. 330:16–331:1). Sean attended academic lab, which did not have its own curriculum and instead was aimed at assisting students with organization, completion of work, display of effort, and focus. (N.T. 369:23–370:23). Students are graded on

---

attempt to keep Sean from failing Algebra I. (*See* S-25 at 2–10). Although Sean met his IEP math application goal, he failed Algebra I. (S-22 at 2; S-43 at 1).

their behavior in academic lab, and Sean did very well.  (N.T. 370:2–12).  His academic lab teacher testified that, with respect to Sean's behavior and social interactions, she "did not see any issues . . .  during the year that [they] were together."  (N.T. 370:9–13).

Sean's absences decreased in number in 10th grade, but remained imperfect. (HOD ¶ 15) Sean missed as many as 22 days from a single class. (P-11 at 8; P-27 at 14). Sean's academic performance, however, improved.  Sean did not fail any classes in 10th grade and earned final grades of one A, four Bs, and one C, and finished 10th grade with a cumulative grade point average of 2.0441.  (HOD ¶ 16).

Sean made marginal progress on his IEP goals, but his progress was erratic.  (HOD ¶ 13). Sean was stagnant in reading comprehension initially, but eventually exceeded his goal-level IEP score in the final marking period. (HOD ¶ 13; P-28 at 5-8). Written expression also declined initially, but rose in the final marking period.  (HOD ¶ 13).  Sean exceeded his mathematics target score (9.0) by attaining an 11.9 during the first marking period, but failed to achieve similar scores during the final three marking periods (returning a 5.8, 5.8, and 8.0).  (HOD ¶ 13; S-30 at 3).

On April 22, 2014, an IEP meeting was held to prepare for the following year. The team kept similar goals and SDIs from 10th to 11th grade.  The IEP contained one goal each in written expression, mathematics, and reading comprehension.  (HOD ¶ 18).  The April 2014 IEP retained SDI aimed at keeping Sean on task.  (HOD ¶ 19).

### 4.     *2014-15 School Year (11th Grade)*

After Sean's 11th grade school year had begun, the School District held another IEP meeting on October 30, 2014, and additional SDIs were added to Sean's IEP as a result. The new SDIs granted access to the testing center for assessments and modified tests and quizzes to

reduce choice options, shorten questions, and alter formatting in order to "support legibility and focus." (HOD ¶ 20; S-34 at 22). Two additional SDIs, implemented daily across all classes, instructed teachers to provide "[p]ositive feedback when Sean is on task and/or advocating for himself" and "[v]erbal and/or non-verbal prompts to support on-task behavior." (HOD ¶ 20; S-34 at 22). Throughout the year, a special education teacher worked with Sean in the academic lab to complete English assignments. (N.T. 442:12–18), but Sean's relationship with his 11th grade English teacher was strained. (HOD ¶ 21).

The record shows that there was a growing concern about Sean's mental health in late 2014 and early 2015. The record shows that Sean was skipping afternoon classes and reported experiencing anxiety and depression related to school. (N.T. 450:3-12; N.T. 422:18-25; N.T. 165:4–166:6; P-13). In December 2014, Sean's treating physician gave Sean's mother Helen a letter expressing that stress related to school had adversely affected Sean's mental health "to the point where [the physician] had to intervene with medication and a referral to counseling" and the physician was seriously concerned about Sean's mental health. (HOD ¶ 22). Helen showed the letter to the District, but did not provide a copy. (HOD ¶ 23). Sean's mother shared another letter with the District in February 2015 from a counselor treating Sean "for feelings associated with anxiety and depression." (HOD ¶ 24). On February 27, 2015, Sean's mother spoke to the school guidance counselor because Sean's therapist recommended cyber school through Brandywine Virtual Academy due to "continuing concerns and anxiety." (S-50 at 59). Following Sean's mother's request for cyber school, the School District held an IEP meeting on March 3, 2015, where the IEP team created a plan while waiting for Sean's transition to cyber school. (HOD ¶ 26; S-36 at 9).

Sean's IEP was revised in March 2015. The March 2015 IEP included information from Sean's treating physician and counselor. (HOD ¶ 27). SDI modifications included access to an emotional support classroom as needed and an explicit schedule change that allowed Sean to complete English classwork in the emotional support classroom at his request. (HOD ¶ 27). Sean rarely requested moving to the emotional support room.[9] (N.T. 503:16–505:5).

In April 2015, Sean's IEP was revised again. (HOD ¶ 28). At the time of the revision, Sean had excessive absences: 25 in mathematics, 24 in science, 29 in academic support, and 30 in English. (HOD ¶ 31). While the April 2015 IEP noted that Sean had achieved the academic goals in mathematics and reading comprehension, two additional behavior-related annual goals for (1) anxiety recognition/social-response and (2) self-advocacy were added. (HOD ¶ 29–30; S-38 at 35–38). SDIs relating to coping skills and anxiety management—including one where Sean would receive daily instruction in coping skills and anxiety management—were also added to the IEP. (HOD ¶ 32; S-38 at 39).

While Sean's attendance problems persisted throughout the year, Sean did not fail any classes in 11th grade, earned final grades of five Bs, one C, and one D (in English), and ended the year with a cumulative grade point average of 2.1863. (HOD ¶ 33).

At the end of 11th grade, the School District completed a Reevaluation. (S-40). The May 29, 2015 Reevaluation Report revealed Sean was still eligible for special education as a student with a specific learning disability. (S-40 at 13). Sean's social, emotional, and behavioral needs were assessed through student, parent, and teacher completion of the Conners Behavior Rating Scales, which measures a student's perception of behaviors and aids in identifying disorders and

---

[9] The IEP explained that "[b]ecause of documented need in coping skills and stress management the [Local Educaiton Agency] is proposing Sean be scheduled into a direct instruction emotional support class to receive training in these areas." (S-38 at 46).

problem behaviors. (S-40 at 10-11). While Sean's self-reported information fell within ranges indicating a clinical diagnosis, reports from teachers of the extent to which Sean's emotional issues affected his schoolwork were mixed and at the time of the Reevaluation and the parent form had not been returned. Accordingly, there was insufficient information to make a determination about Sean's emotional or behavioral needs. (S-40 at 13). Explaining that additional information was needed, the School District then issued a new Permission to Reevaluate, seeking consent for a psychiatric evaluation and evaluation through the school refusal program. (S-41 at 1-6).

### 5.    *2015-16 School Year (12th Grade)*

Per the parties FAPE waiver agreement,[10] Sean attended half a day of cyber school for the 2015-16 school year. At the start of the Due Process hearing, Sean was a high school senior on track to graduate at the end of the school year. (N.T. 135:10-23; N.T. 223:1-8). During his 12th grade year, Sean performed well at Technical College High School. (N.T. 196:19-20).

## B.    **Procedural History**

The current dispute began on December 22, 2015, when Sean's mother initiated a complaint and requested a special education due process hearing under the IDEA and corresponding state regulations. Seans's mother alleged the School District consistently failed to identify and meet his academic, social, emotional, educational, and behavioral needs. (Due Process Compl. 3). More specifically, Plaintiff alleged Sean's IEPs contained inadequate education levels and inappropriate goals that failed to address all of his needs or provide a sufficient, objective means of monitoring progress. (Due Process Compl. 4). The complaint

---

[10] Before Sean could attend cyber school, the School District required a FAPE waiver agreement. N.T. (568:18-22). The agreement would allow Sean to attend half-day instruction at Technical College High School and half-day instruction at Brandywine Virtual Academy in satisfaction of the School District's obligation to provide him with a FAPE. (*See* S-51). After receiving the necessary documents for the FAPE waiver, Sean's mother hired counsel. (N.T. 581:9-11; N.T. 210:16-21).

sought full days of compensatory education for the 2012–13,[11] 2013–14, and 2014–15 school years.  (Due Process Compl. 1–2).

The Hearing Officer conducted a 3-day evidentiary hearing over March 15, 2016, May 18, 2016, and June 1, 2016. Both parties to presented evidence and testimony. After the submission of the parties' written closing arguments and review of the documents and testimony, the Hearing Officer issued a decision on July 8, 2016 denying all requested relief to the family.

The Hearing Officer's decision recognized that the evidence in Sean's case was not "clear cut."  (HOD at 8).  The Officer concluded that all witnesses were found to have testified credibly and accorded heavy weight to testimony by Helen (Sean's mother) and the School District's emotional support teacher.  (HOD ¶ 34).  All other witnesses were accorded a medium degree of weight.  (HOD ¶ 34).  The Officer observed that Sean's academic performance, goal-progress, and behavioral progress proceeded in fits and starts:

> In the 9th grade, the student made the most consistent goal-progress; yet the student's absences were numerous, and the student's academic work was abysmal. In 10th grade, the student's goal-progress was minimal; yet the student's attendance and academic with both dramatically improved. In 11th grade, there is evidence of goal-progress and the student's academic with was strong—the sole exception being English where the student and teacher had a personality conflict; yet the student's outsized number of absences returned. Taken as a whole, as the evidence unfolds school year by school year, it does not amount to a denial of a FAPE.

(HOD at 8).  The Hearing Officer concluded, with respect to 9th grade, that Sean's poor grades were due in large part to absenteeism, and that Sean did not, on balance, exhibit behaviors that

---

[11] As part of the School District's due process proceedings, the Hearing Officer considered evidentiary material from May 2012, when plans were made for Sean's 2012–13 school year, through material from the end of the 2014–15 school year. *See* Know or Should Have Known ("KOSHK") Ruling 1. The first day of the Hearing addressed the statute of limitations for Plaintiffs' claims and the date Sean's mother knew or should have known of the alleged educational injury. Pls.' Proof of KOSHK 1. After the first day, the Hearing Officer decided to allow claims for the 2012–13 school year because the earliest indication of the potential denial of FAPE was in December 2014 or January 2015, when Sean's mother requested specific changes to his education. KOSHK Ruling 5.
    The District maintains that the Hearing Officer erred in considering a claim for the 2012–13 on the merits because the IDEA's statute of limitations bars relief prior to December 22, 2013.  The Hearing Officer's allowance of the 2012–13 claim is irrelevant here, however, because the Court affirms the Hearing Officer and denies relief.

caused educators to view him as having anxiety. (HOD at 8). Instead, the Hearing Officer concluded that where Sean's affect in class was inattentive or distracted, the record demonstrated that such behavior was rooted in tiredness or sociability. (HOD at 8).

The Hearing Officer noted that even if it were to assume that it was prejudicial to not address Sean's absenteeism, the District did not deny a FAPE because Sean's absences and grades improved dramatically in 10th grade. (HOD at 9). While those elements of Sean's education improved, the IEP goal achievement, which the Hearing Officer recognized as the "main driver of IEP instruction"—was only marginally present. He ultimately concluded that Sean made meaningful progress, "but not by much." (HOD at 9).

Finally, with respect to Sean's 11th grade year, the Hearing Officer determined that "the record supports a conclusion that the student may have felt anxiety and a result of issues at school, and the District revised the IEP to reflect that, but educators were not seeing anxiety-related behaviors in the school environment." (HOD at 9). The Hearing Officer focused on Sean's overall academic success and noted that a personality conflict between Sean and his English teacher drove his lack of achievement in that subject. (HOD at 9).

Taken together, the Hearing Officer concluded that Sean was not denied a FAPE for the school years 2012–13 through 2014–15. (HOD at 10). Following the Hearing Officer's decision, Plaintiffs filed a Complaint with this Court. [12] Plaintiff and Defendant filed cross-motions for judgment on the administrative record, seeking a judgment in their favor based on the Court's review of the administrative record pursuant to 20 U.S.C. § 1415(i)(2).

---

[12] The Complaint alleged violations of the IDEA's federal and state implementing regulations; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and its federal and state implementing regulations; the Americans With Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, and its federal and state implementing regulations; and Chapters 14 and 15 of the Pennsylvania Code. Plaintiffs clarified their motion for judgment on the administrative record that they seek relief solely under the IDEA and its federal and state implementing regulations. *See* Pls'. Br. at 1 n.1.

## II.    LEGAL STANDARD

A district court has jurisdiction to review the findings and decision of the state educational agency under 20 U.S.C. § 1415(i)(2)(A).  The party seeking relief (here, the Plaintiffs) bears the burden of persuasion before the district court.  *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3rd Cir. 2012); *E.D. by & through T.D. v. Colonial Sch. Dist.*, No. CV 09-4837, 2017 WL 1207919, at *11 (E.D. Pa. Mar. 31, 2017) ("The burden lies with Plaintiffs to show that [the student] was denied a FAPE since they are the ones that are challenging the administrative decision.").

A court reviews the IDEA decision of a Due Process Hearing Officer under a nontraditional standard of review known as "modified *de novo*."  *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010).  Under a "modified *de novo*" standard, a court must give "due weight and deference" to the findings in the underlying administrative proceedings.  *Id.*  The purpose of the "due weight" obligation is to "prevent[] district courts from imposing their own view of preferable educational methods on the states."  *Id.*; *see also State-Operated Sch. Dist. of City of Newark*, 336 F.3d at 270 ("The court is not . . . to substitute its own notions of sound educational policy for those of local school authorities.").

When applying the modified *de novo* standard, district courts consider the factual findings from the administrative proceedings *prima facie* correct.  *Bayonne*, 602 F.3d at 564.  This posture does not preclude the court from considering the evidence to make additional or differing factual findings based upon a preponderance of the evidence.  *See* 20 U.S.C. § 1415(i)(2)(C).  After review of the administrative record, a court may choose to accept or reject the factual findings of the Hearing Officer.  *Colonial Sch. Dist.*, 2017 WL 1207919, at *5.  Courts should defer to the hearing officer's factual findings unless it can point to contrary non-

testimonial evidence in the record to support its conclusions. *Tyler W. ex rel. Daniel W. v. Upper Perkiomen Sch. Dist.*, 963 F. Supp. 2d 427, 432 (E.D. Pa. 2013). If, based upon the record, the reviewing court does not adhere to the hearing officer's factual findings, "it is obliged to explain why." *Bayonne*, 602 F.3d at 564 (internal quotation marks omitted).

Where, as here, the hearing officer "heard live testimony and determined that one witness is more credible than another witness, [that] determination is due special weight." *Id.* Accordingly, a district court "must accept the state agency's credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion.'" *Id.* (quoting *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004)) (clarifying that the word "justify" essentially requires the same standard applied by a federal appellate court to a trial court's findings of fact).

## III.   DISCUSSION

After reviewing the applicable statutory framework, the Court will evaluate the Plaintiffs' challenges to the Hearing Officer's decision. The Hearing Officer proceeded chronologically through each of the three school years at issue. Plaintiffs' challenges to the adequacy of the School District's educational plans for Sean and the School District's response to Sean's needs raise similar issues and themes across the three school years, however. Specifically, Plaintiffs mount a broad challenge as to each year regarding the IEP's alleged insufficiencies with respect to Sean's behavioral, executive functioning, and emotional difficulties. Additionally, they take issue with the amount of academic progress made by Sean. The Court addresses each of Plaintiffs' concerns in turn, and as related to each school year in question.

While the Court recognizes that Sean's educational experience may not have been ideal, it concludes that the School District adequately fulfilled its obligation to provide Sean with a

FAPE. Therefore, it will deny Plaintiffs' motion, grant the School District's motion, and affirm the Hearing Officer's decision.

**A.      Statutory Framework**

The Individuals with Disabilities Education Act reflects an "ambitious federal effort . . . passed in response to Congress' perception that a majority of handicapped children in the United States were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to drop out." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist, Westchester Cty. v. Rowley*, 458 U.S. 176, 179 (1982) (internal quotation marks omitted). Under the IDEA, states receiving federal educational assistance must establish "policies and procedures" to ensure a "free appropriate public education" for all children with disabilities. 20 U.S.C. § 1412(a)(1)(A); *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 244 (3d Cir. 2012). In the context of the IDEA, "'education' extends beyond discrete academic skills and includes the social, emotional, and physical progress necessary to move the child toward meaningful independence and self-sufficiency consistent with the child's cognitive potential." *M. v. Penn Manor Sch. Dist.*, No. 12-3646, 2015 WL 221086, at *4 (E.D. Pa. Jan. 14, 2015). A FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Rowley*, 458 U.S. at 188–89.

Once a child is identified, the school district is required to provide a FAPE by developing an IEP for the child "that is uniquely tailored to his or her individual needs." *Penn Manor Sch. Dist.*, WL 221086, at *4; *see also* 20 U.S.C. § 1414(d) (defining IEP as a "written statement for each child with a disability that is developed, reviewed, and revised" in accordance with Section 1414). The IEP includes, *inter alia*, a statement of the child's present levels of academic

14

achievement and functional performance; a statement of measureable, annual goals, including academic and functional goals; and a statement of how the child's progress toward the annual goals will be measured. *See* 20 U.S.C. § 1414(d)(1)(A)(i). The purpose of the IEP is to establish a plan for the academic and functional advancement of the child in light of that child's particular circumstances. *See Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017).

The IEP must provide a "meaningful educational benefit" to the child. *Bayonne*, 602 F.3d at 556–57. It is insufficient under the IDEA for a school district to provide merely more than a trivial educational benefit to students, but a school district is not required to maximize a child's potential. *See Bayonne*, 602 F.3d at 556; *State-Operated Sch. Dist. of City of Newark*, 336 F.3d at 271 ("The IDEA does not require the School District to provide [a student] with the best possible education.").

The United States Supreme Court recently revisited the standard for determining when children receive sufficient educational benefits to satisfy the IDEA. *See Endrew F.*, 137 S. Ct. at 999–1002.[13] The Court in *Endrew F.* rejected the notion that compliance with the IDEA requires that an educational program provide merely more than *di minimis* progress, and concluded that the IDEA demands more. *Id.* at 1001. It concluded that "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 999. The Court emphasized, however, that "reasonably calculated" progress is highly individualized:

---

[13] The Tenth Circuit's "*de minimis*" test differs from the standard employed by the Third Circuit Court of Appeals prior to the *Endrew F.* decision, see *M.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 396 (3rd Cir. 1996), and was not applied by the Hearing Officer in this case. The standard employed by the Hearing Officer required that the IEP be "reasonably calculated to yield meaningful educational benefit to the student." (HOD at 7). This standard does not "differ substantively from the standards adopted by the Supreme Court in *Endrew F.*" *Colonial Sch. Dist.*, 2017 WL 1207919 at *11 (noting that a special education due process hearing officer who applied the Third Circuit Court of Appeals' standard in was in accord with the *Endrew F.* standard). To the extent that Plaintiffs may imply that the incorrect standard was applied here, the Court rejects that argument.

The 'reasonably calculated' qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials. The Act contemplates that this fact-intensive exercise will be informed not only by the expertise of school officials, but also by the input of the child's parents or guardians. Any review of an IEP must appreciate that the question is whether the IEP is *reasonable,* not whether the court regards it as ideal.

*Id.* (internal citations omitted). In adopting a reasonableness approach tailored to each student, the Court declined to create a bright-line rule. It clarified that the "absence of a bright-line rule, however, should not be mistaken for an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* at 1001. The Supreme Court's instruction that a district court should refrain from retrospectively substituting a program it deems preferable is in line with the Third Circuit Court of Appeals' approach. The Court of Appeals has held that "the measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date." *Fuhrmann ex rel. Fuhrmann v. E. Hanover Bd. of Educ.*, 993 F.2d 1031, 1040 (3rd Cir. 1993). Accordingly, a court should avoid any "Monday Morning Quarterbacking" in evaluating the appropriateness of a child's educational program. *Id.*

In the absence of a bright-line rule, courts analyze whether a child has received a "meaningful educational benefit," by "look[ing] to regular examinations, grades, and advancing from grade to grade as important factors." *Colonial Sch. Dist.*, 2017 WL 1207919 at *11. Accordingly, the Court here is obliged to determine, whether Sean's IEPs, given the facts at the time and in light of his progress during the years at issue, conferred meaningful educational benefit.

### B.    Sean's Behavioral Needs

The crux of Plaintiffs' challenge is that the School District failed to provide Sean a FAPE because Sean's IEPs did not adequately address concerns about his attendance, executive

functioning, social/emotional function, and behavior. In other words, the IEPs failed to confer meaningful benefit as to those issues. This inadequacy, in turn, affected Sean's academic performance. Plaintiffs ultimately recognize, however, that the School District altered Sean's IEPs once confronted with opinions from medical professionals supporting Sean's anxiety related to school.

The Hearing Officer found that Sean's IEPs contained goals in written expression, reading comprehension, and mathematics.[14] Although the IEP contained no goals explicitly related to behavior or executive functioning, such as anxiety-recognition or self-advocacy, until April 2015, (HOD ¶ 30), the earlier IEPs included SDIs and program modifications to address problematic or disruptive behaviors in, such as verbal prompting. (HOD ¶ 12). While Hearing Officer noted that the record supported the conclusion that Sean was inattentive or distracted in school, he determined, based upon testimony at the hearing and other evidence, that Sean's behavior did not cause educators to view him as having anxiety. (HOD at 8). Because Sean appeared engaged and social with peers, he concluded that Sean's problematic behaviors, to the extent they were present, were rooted in tiredness or sociability. (HOD at 8).

Hearing Officer concluded that Sean's IEP was revised at annual intervals or more frequently upon new information. (HOD ¶¶ 10, 17, 20, 26, 28). The Hearing Officer found that program modifications and SDIs were added and sometimes repeated in each IEP. For example, the April 2014 IEP repeated a previous program modification for prompting, but the October 2014 revision added SDIs for positive feedback in response to desired behaviors. (HOD ¶¶ 19–20). Upon receiving information provided to the School District, it revised Sean's IEPs in March

---

[14] The IEP created in May 2012 contained on goal each in written expression and reading comprehension, and two goals in mathematics. HOD ¶ 5. The April 2013 IEP contained one goal each in written expression, mathematics, and reading comprehension. HOD ¶ 11. The April 2014 IEP contained one goal each in written expression, mathematics, and reading comprehension. HOD ¶ 18.

and April 2015.  (HOD at 9).  The Hearing Officer found that the record supporting a conclusion that Sean suffered from anxiety as a result of issues at school at that time, but noted that educators were not seeing any anxiety-related behaviors in school that would have notified them of a problem, even if Sean was indeed suffering from anxiety.  (HOD at 9).  The Hearing Officer determined that the School District nevertheless revised Sean's IEPs to reflect growing concerns over Sean's anxiety.  (HOD at 9).

Plaintiffs argue that "[d]espite overwhelming evidence of [Sean's] executive functioning, social/emotional, and behavioral needs, the [School] District utterly failed to address [Sean's] needs in these areas."  Pl. Br. at 20.  They highlight that Sean's IEP goals related only to academic areas and characterizes the SDIs included in Sean's IEPs throughout the years as accommodations and not actual instruction. Plaintiffs believe Sean was denied a FAPE because the School District provided no goals in critical areas of need that they contend the School District was well aware of, such as anxiety-related coping skills, attention and focus, organizational skills, study skills, and assignment completion.

Contesting the Hearing Officer's decision, Plaintiffs note that Sean's issues with attention and anxiety began before high school according to clinical rating scales included in his early evaluations.  Therefore, Plaintiffs argue that Sean's behavioral and executive functioning needs should have been addressed by his 9th grade IEP.  Because the 9th grade IEP was insufficient, Plaintiffs contend that the subsequent IEPs were similarly problematic because they remained largely unchanged from year to year.  Likewise, Plaintiff suggests the School District's reevaluations of Sean were inappropriately late in response to his behavioral issues.  The additions that were eventually made to Sean's IEP to address his anxiety, behaviors, and emotional functioning were, accordingly to Plaintiffs, emblematic of "too little too late."

The School District takes the position that they addressed any known potential behavioral issues with executive functioning supports, such as verbal prompts, clear and concise directions, and weekly support for organization. Additionally, the School District points out that a child's needs and weaknesses can be appropriately met with accommodations or modifications because not every concern requires an IEP goal. Moreover, the School District argues the IEP team responded to each of Sean's needs as the behaviors rose in severity and was not required to take further action when a modification accommodated a behavioral concern.

The School District also highlights the changes made to Sean's IEPs at yearly intervals and as behavioral concerns arose. With respect to Sean's 9th grade year, the School District argues that nothing more than verbal prompting was required to address the Reevaluation Report note that Sean needed prompting to remain on task. These prompts were continually included in the IEP because inattention remained a concern. After 10th grade, the School District argues there was not a substantial need for changes to Sean's support because of his successful school year. Finally, the School District points out that it responded appropriately to Sean's anxiety by adding coping and self-advocacy goals coupled with daily direct instruction in anxiety management once it was presented with concerns from Sean's mother, supported by medical opinion.

Plaintiffs argue the School District should have used measurable goals or conducted an FBA to address Sean's behavioral and executive functioning needs, but the Court declines to overturn the Hearing Officer's decision on this basis. School districts are indeed required to provide behavioral support when a student can no longer make meaningful educational progress otherwise. *See, e.g.*, *M.C.*, 81 F.3d at 394 (affirming the district court's order requiring residential placement for a student where efforts to improve a student's toileting, eating, and

communication skills—required for meaningful educational progress—would only occur in the context of residential care). The argument Plaintiffs put forth is essentially a version of the "Child Find" requirement of the IDEA,[15] which requires school districts to evaluate students who are reasonably suspected of having a disability under the statutes. *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 249 (3d Cir. 2012). The IDEA does not, however, "demand that schools conduct a formal evaluation of every struggling student." *Id.* "[S]chools need not rush to judgment or immediately evaluate every student exhibiting below-average capabilities . . . . Moreover, neither the failure to employ a functional behavioral assessment nor a subsequent disability finding is *per se* indicative of an inappropriate evaluation." *Id.* at 252 (concluding that a student was not denied a FAPE where, despite not identifying him as IDEA-eligible, the district took measures to address behavioral and concerns). Furthermore, "the sufficiency of chosen strategies for dealing with problematic behavior is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Coleman v. Pottstown Sch. Dist.*, 983 F. Supp. 2d 543, 565 (E.D. Pa. 2013), *aff'd in part,* 581 F. App'x 141 (3d Cir. 2014) (internal alterations and quotations omitted).

The case is similar to *Coleman v. Pottstown Sch. Dist.* where the court found that a school district provided a FAPE by taking proactive steps to address the student's behaviors without explicit behavioral goals. 983 F. Supp. 2d at 570-71. The school district recognized the

---

[15] For example, the Plaintiffs take issue with the School District's failure to conduct a Functional Behavior Assessment ("FBA") to better determine the cause of Sean's problematic behaviors. According to Plaintiffs, FBAs are designed to identify "triggers" and antecedents to problematic behaviors so that a Positive Behavioral Support Plan ("PSBP") can be designed and implemented for the student. Plaintiffs cite two cases in support. *See G.D. ex rel. G.D. v. Wissahickon Sch. Dist.*, 832 F. Supp. 2d 455 (E.D. Pa. 2011); *Lauren P. ex rel. David P. v. Wissahickon Sch. Dist.,* No. CIV.A.05-5196, 2007 WL 1810671, at *1 (E.D. Pa. June 20, 2007), *aff'd in part, rev'd in part sub nom. Lauren P. ex rel. David & Annmarie P. v. Wissahickon Sch. Dist.*, 310 F. App'x 552 (3d Cir. 2009).
　　In both of these cases, the District Court was affirming underlying administrative decisions concluding that the student had been denied a FAPE. Further, the students in both cases had been identified as having attention deficit hyperactivity disorder and other behavioral issues at an early stage. *See Lauren P.*, 2007 WL 1810671, at *1; *G.D. ex rel. G.D.*, 832 F. Supp. 2d at 457. That is not the procedural or factual context in which this case arises.

student's behavioral issues, but did not believe the behavior was severe enough to warrant more than weekly counseling because the student was producing passing work and the school district believed the behavior was rooted in the student missing his family. *Id*. at 558. The school district decided not to conduct an FBA. *Id*. The student's IEPs included multiple SDIs, such as cueing to remain on task, repeated directions, and a small classroom setting. *Id*. at 556–57. Plaintiffs argued that the student was denied a FAPE due to the school district's failure to set "quantifiable or measure goals," to provide "more intensive counseling," or conduct an FBA. *Id*. at 570–71. In reaching the conclusion that the student received a FAPE, the district court noted that a school district must take problematic behaviors into account when developing an IEP. *Id*. at 571. However, the school district met this requirement by taking proactive and consistent steps to address the student's behaviors. *Id*.

Here, Plaintiffs' argument does not support a reversal of the Hearing Officer's decision that, based upon the testimony and evidence, Sean's behavioral issues were not out of the ordinary initially, and when they became more concerning, the School District responded proportionately. The Court recognizes that Sean had some reported behavioral concerns prior to the 2012–13 school year, but there is not sufficient evidence to justify concluding—in contravention to the Hearing Officer—that Sean's inattentiveness and behavioral issues rose to the level that commanded different treatment by the IEP. Although the IEP team created no specific goals addressing Sean's behavior or executive functioning issues until the end of 11th grade, the School District put SDIs in place to address behavioral issues. As the Hearing Officer recognized, the School District included prompting in the May 2012 IEP. In 10th grade, Sean received verbal prompting in the classroom to help him remain on task and attended an academic lab, which was designed to address his difficulties with completion of work and focus.

When, in 11th grade, the School District was presented with evidence of growing concern over Sean's behavioral issues and mental health, including communications from treating medical providers, it responded with a more aggressive plan, elevating the behavior modification instructions memorialized in Sean's IEP's previously to concrete goals included in his IEP. The biggest concern during 11th grade was Sean's struggle with anxiety. The Hearing Officer concluded, based upon mixed testimony at the hearing, that Sean did not exhibit behaviors that caused educators to view him as having anxiety. Responding to Sean's problems in his 11th grade English class—where Sean had a strained relationship with his teacher—Sean's IEP team met in October. The October changes included three SDIs, addressing modified tests/quizzes, access to the testing center, and positive feedback in response to on-task behavior, that sought to improve Sean's focus and complete his class assignments.

Two additional revisions took place in 2015, in response to additional information provided to the School District. Based upon information provided to the School District, the Hearing Officer determined that the record supported a conclusion that Sean may have felt anxiety as the result of school, despite the fact that some educators were not witnessing anxiety-related behaviors.

Although the record supports, and the Hearing Officer concluded, that Sean exhibited some problematic behaviors at the outset, and throughout the school years at issue, the School District took steps reasonably calculated to address his needs, given the information it had at the time each IEP was created or revised. Pursuant to *Endrew F.*, to comply with the IDEA, a School District must create a reasonable—which may admittedly not be ideal—IEP incorporating the information available at the time. Given the Hearing Officer's determination, and respectful of the instruction not to substitute the Court's own notions of sound educational

policy for those of the School District's administrators, the Court concludes that School District did not deny Sean a FAPE for the years at issue.

### C.    Sean's Academic Progress

While Plaintiffs' argument as to Sean's academic progress is somewhat enmeshed in their argument about his behavioral needs.  For each of the school years at issue, the Hearing Officer found that Sean made goal progress. Specifically, the Hearing Officer concluded that Sean made progress throughout 9th grade on all four goals and his goal progress was the most consistent of all the years at issue. (HOD ¶ 6; HOD at 8). As to 10th grade, the Hearing Officer found that Sean's goal progress was minimal, but still meaningful. (HOD at 9).  The Hearing Officer also concluded that Sean made goal progress for the first half of his 11th grade year, before the School District began revising his IEP.  (HOD at 9).

In response to the Hearing Officer's conclusions, Plaintiffs argue that Sean made, at best, minimal progress.  Plaintiffs take the position that the Hearing Officer took a myopic view, and erroneously focused on very limited, single pieces of Sean's progress without appreciating his overall lack of progress. Plaintiffs characterize Sean's progress as the type of *de minimis* progress that is insufficient for an appropriate education and claim that his overall educational functioning actually regressed.

In response, the School District points out that Sean's IEP scores showed a trend of progress, not a trend of regression. The School District argues that Sean advanced in his overall executive functioning rather than regressed and asserts that Sean did well in school when he completed his work and attended classes.

The Court declines to reverse the Hearing Officer's decision that Sean made meaningful progress.  The Court is unpersuaded that the Hearing Officer applied a narrow focus aimed at

some evidence to the exclusion of the rest. Indeed, the Hearing Officer contemplated that Sean's case was not clear cut. He specifically concluded out that, while Sean did not always make strong goal progress, the progress was not so minimal that Sean was denied a FAPE. During 9th grade, Sean reached all goals listed in his May 2012 IEP. For the April 2013 IEP, Sean did make less clear progress on his academic goals. However, Sean met his written expression goal score for the year and eventually reached his reading comprehension goal. On his April 2014 IEP, Sean consistently met his math and reading goals and it was noted that his "writing ability ha[d] improved considerably." P-16 at 21–26. These patterns of goal achievement support the Hearing Officer's finding that Sean's progress for the school years at issue was more than the *de minimis* progress rejected by the Supreme Court in *Endrew F.*

The Court concludes that Sean made progress, although he may not have advanced in all areas of need. In *Colonial Sch. Dist.*, 2017 WL 1207919 at *13, the court found that a student was provided a FAPE although she did not progress in all demonstrated categories of need. The student's report card showed that she made little to no improvement in some language-based skills and reading, but improved in some language-based skills and math-based skills. *Id.* Regardless of the school district's failure to consider the student's deficits in all academic areas, the Hearing Officer decided that the student showed progress. *Id.* The court affirmed the decision of the Hearing Officer, noting his conclusion that the student received a FAPE was reasonable in records. *Id.*

As noted in *Colonial Sch. Dist.*, progress does not require that Sean advance in all categories of his education. Although the IEP goals did not address all of Sean's potential areas of need, the IEP was reasonably calculated to allow Sean to make appropriate progress based on the prospective judgment of the school officials. With the knowledge that Sean had a Specific

Learning Disability in areas of reading, writing, and mathematics, the School District focused on Sean's known deficiencies to allow him to make progress. For a child such as Sean, who was "fully integrated in the regular classroom, an IEP should . . . be 'reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.'" *Endrew F.*, 137 S.Ct. at 999 (quoting *Rowley*, 458 U.S. at 203-04). Like the student in *Colonial Sch. Dist.*, Sean made progress through academic goals and program modifications that focused on his known needs.

Additionally, the School District updated IEP goals as Sean's needs evolved. The School District kept a similar plan for Sean's transition to high school because he successfully completed his 8th grade classes. As Sean entered 10th grade, the School District changed Sean's IEP goals to more accurately reflect the actual instruction given in high school. The School District also added an academic lab class to assist Sean in a smaller group setting in response to his poor 9th grade academic performance. Based on Sean's improved grades and attendance in 10th grade, there was no indication the School District needed to address Sean's needs with any mid-year modifications. As Sean entered 11th grade, there was no compelling reason for the School District to drastically modify an IEP that allowed Sean to excel throughout 10th grade. These updates to Sean's academic goals were prospectively and reasonably calculated to allow him to advance from grade to grade and make progress.

Although Sean was delayed in immediately advancing to 10th grade, he did make progress on his IEP goals and advanced to 10th grade by completing a summer class. Under the IDEA, actual progress is not required as long as an IEP is reasonably calculated to allow the student to make progress. There is no reason for the Court to conclude that each IEP goal was not reasonably calculated after each school year to allow Sean to make "progress appropriate" in light of his past academic performance and past progress toward IEP goals.

## IV.    CONCLUSION

After giving due weight to the decisions of the Due Process Hearing Officer, the Court is unpersuaded that the evidence on the record demands rejecting its conclusions and considers the Hearing Officer's decision reliable.  Accordingly, Plaintiffs' motion for judgment on the administrative record will be denied, and the School District's motion will be granted.

An appropriate order follows.

BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge